Bobby Marion FRANCIS,
Petitioner–Appellant,

v.

Richard L. DUGGER, Secretary, Florida
Department of Corrections,
Respondent–Appellee.

No. 88–6001.

United States Court of Appeals,
Eleventh Circuit.

July 24, 1990.

Billy H. Nolas, Capital Collateral Representative, Tallahassee, Fla., for petitioner-appellant.

Ralph Barreira, Asst. Atty. Gen., Dept. of Legal Affairs, Miami, Fla., for respondent-appellee.

Before KRAVITCH, HATCHETT and ANDERSON, Circuit Judges.

PER CURIAM:

In this capital sentence case, we are asked to determine whether the district court erred when it denied Bobby Marion Francis a writ of habeas corpus. Finding that Francis is not entitled to a writ of habeas corpus, we affirm the district court.

### FACTS

The Florida Supreme Court described the murder of Titus Walters as follows:

The victim, Titus Walters, was a confidential informant. He was being used in a drug investigation in early August 1975. A conversation which he had with the sheriff's office in connection with this investigation had resulted in Francis' arrest for dealing in narcotics. After this incident, Francis had vowed that he would kill Walters. The events leading to the actual murder of Titus Walters apparently began on August 16, 1975, when Opal Lee and Charlene Duncan went to Key West from Miami to deliver a package from Francis to Elmer Wesley. Francis had given Duncan some money for her bus ticket. Upon arriving in Key West, Lee and Duncan went to the home of Elmer Wesley. There they were introduced to Walters who tried to make a move on Lee. Walters continued to harass them and eventually punched Lee in the face, knocked her down, and pulled out a gun and shot at Duncan. Duncan then called Francis in Miami and

told him what had occurred. Francis agreed to go to Key West, which he did on August 17, 1975. Francis, Willie Orr (who had come with Francis from Miami), Elmer Wesley, Duncan, and Lee went to Wesley's house where Francis, with the expressed intent to kill Walters, lay in wait for Walters. When Deborah Wesley Evans (Elmer Wesley's sister), Arnold Moore, and Walters arrived at Wesley's home, Francis, Lee, Orr, and Duncan came out from behind the curtain that separated the living room from the kitchen. Francis told Walters to get on his knees and asked him why he punched Francis' woman in the mouth. Walters began to plead with him to let him explain. Orr, at that point, took Evans and Moore into the kitchen. They heard a gunshot and heard Walters plead for his life. Francis had shot into the floor. Francis then took Walters into the bathroom, made him sit backwards on the commode, put a washcloth in his mouth, and taped his hands and mouth. Francis went into the kitchen and requested syringes and Drano which he proposed to inject into Walters. These were subsequently obtained and were later found in Wesley's home. He went into the bathroom and shot Walters in the head, but the wound was not fatal. Francis, with pillow and gun in hand, came into the kitchen and informed those present that the victim must have strong roots because he would not die. He told the others that they were all part of the conspiracy and that they would have to dispose of the body. He then went back into the bathroom and fatally shot Walters through the heart.

When Walters' body was found in a bathtub in the Key West home, his hands were bound and his mouth was taped. Powder burns on his body indicated that he had been shot at close range. The police officers recovered a pillow with six holes and a black substance on it which were consistent with gunshots being fired through it.

*Francis v. State*, 473 So.2d 672, 673–74 (Fla.1985), *cert. denied*, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986).

## PROCEDURAL HISTORY

On August 27, 1975, a state grand jury indicted Francis, and others, for the first-degree murder of Titus Walters. After a trial in 1976, a jury convicted Francis of first-degree murder and recommended the death penalty. The trial court sentenced Francis to death. Prior to hearing the direct appeal, the Florida Supreme Court relinquished jurisdiction to the trial court which granted Francis a new trial after a finding that his trial counsel rendered ineffective assistance of counsel.

After a second trial in 1979, a jury again convicted Francis of first-degree murder and recommended the death penalty; the trial court sentenced him to death. On direct appeal, the Florida Supreme Court reversed the conviction and sentence because Francis had been involuntarily absent during a critical phase of the jury selection process. *Francis v. State*, 413 So.2d 1175 (Fla.1982).

In March 1983, at a third trial, Charlene Duncan, among others, testified against Francis. Duncan had been a co-defendant with Francis at his first trial where a jury convicted her of first-degree murder. The trial court sentenced Duncan to a life sentence without parole for twenty-five years.

In 1979, Duncan entered into an agreement with the state in which she agreed to testify truthfully against Francis at his second trial. In exchange, the state, through its state attorney, agreed that if Duncan's conviction were overturned on appeal, the state would allow her to plead guilty to third-degree murder and receive a sentence of no more than ten years. Further, absent a successful appeal, the state agreed to actively seek executive clemency or a pardon. Duncan testified at the second trial. The Florida Supreme Court did not reverse Duncan's conviction and sentence.

Prior to the third trial, the state entered into another agreement with Duncan in which the state agreed to assist Duncan in preparing and filing a Rule 3.850 motion seeking relief on the ground that, by testifying truthfully at Francis's third trial,

Duncan would be entitled to the benefit of the 1979 agreement (i.e., a plea to third-degree murder and a ten-year sentence). The state did not disclose this agreement to Francis's counsel.

At trial, Duncan gave the following testimony regarding her agreement with the state. Duncan stated that she was serving a twenty-five year sentence and that if she testified truthfully, she would be allowed to plead to third-degree murder with a ten-year sentence, or receive a pardon. Duncan also testified that the prosecutor had arranged a resentencing hearing on her behalf scheduled for April 4, 1983, the week following Francis's third trial. On cross-examination, Francis's counsel asked Duncan if "a new deal has already been processed," to which she replied "no." Further, on recross, Francis's counsel asked Duncan if she had received a pardon. Duncan replied, "No, but I can get one." Duncan did not specifically testify that the prosecutor had agreed to assist her in a Rule 3.850 proceeding.

The state also called Deborah Wesley as a witness. Wesley's testimony corroborated the testimony of the other eye-witnesses to the murder. On cross-examination, defense counsel sought to inquire into a pending unrelated murder charge against Wesley. The trial court sustained the state's objection to the admissibility of this evidence.[1]

The jury convicted Francis of first-degree murder and recommended a life sentence. The trial court, however, overrode that recommendation and imposed the death penalty. On appeal, the Florida Supreme Court affirmed the conviction and sentence. *Francis v. State*, 473 So.2d 672 (Fla.1985), *cert. denied*, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986).

On September 15, 1987, the Governor of the State of Florida signed a death warrant for Francis. Francis then filed two collateral attacks on his death sentence. First, Francis filed a petition for writ of habeas corpus in the Florida Supreme Court. On

November 2, 1987, the Florida Supreme Court denied Francis's petition. *Francis v. Dugger*, 514 So.2d 1097 (Fla.1987). Second, Francis filed a motion to vacate judgment and sentence pursuant to Rule 3.850. After an evidentiary hearing, the trial court denied relief. Francis appealed to the Florida Supreme Court which affirmed the denial of relief. *Francis v. State*, 529 So.2d 670 (Fla.1988).

On September 12, 1988, the Governor signed Francis's second death warrant. Shortly thereafter, Francis filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Florida. 28 U.S.C. § 2254. The district court denied Francis's petition for a writ of habeas corpus and denied a certificate of probable cause to appeal. *Francis v. Dugger*, 697 F.Supp. 472 (S.D.Fla.1988). This court granted a certificate of probable cause and stayed the pending execution.

## CONTENTIONS

Francis contends that the district court erred when it denied his petition for habeas corpus. According to Francis: (1) the state deprived him of a fair trial and due process of law (a) by withholding material evidence (i.e. the state's agreement to assist Duncan in a 3.850 proceeding), and (b) by permitting Duncan to present false testimony regarding that agreement, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the district court erred when it found the *Brady/Giglio* violations to be harmless; (3) the trial court's restriction of the cross-examination of witness Deborah Wesley, concerning her pending criminal charge, violated the confrontation clause, and the district court erred when it found the violation to be harmless beyond a reasonable doubt; (4) Francis's counsel provided ineffective assistance during the penalty phase of his trial; (5) the trial court arbitrarily overrode the jury's life recommendation when it imposed death; (6) the appli-

---

1. A jury subsequently convicted Wesley of second-degree murder. The trial court imposed a thirty-year sentence. The Florida District Court of Appeal affirmed her conviction and sentence. *Evans v. State*, 452 So.2d 987 (Fla. 3d DCA 1984).

cation of the aggravating factor "cold, calculated, and premeditated" violated the ex post facto clause; (7) the district court erred when it determined that sufficient evidence existed to support the aggravating factors of (a) "heinous, atrocious, or cruel," (b) "cold, calculated, and premeditated" and (c) disrupting or hindering the "enforcement of laws"; (8) the state trial court and the Florida Supreme Court interpreted and applied "cold, calculated, and premeditated" as well as "heinous, atrocious, or cruel" in an unconstitutionally overbroad manner, *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); and (9) the district court erred when it held that the trial court's pre-verdict plea offers, to allow Francis to plead guilty to first-degree murder with a life sentence, did not render improper the trial court's subsequent imposition of the death penalty.

In response, the state contends that the district court properly denied Francis's petition for a writ of habeas corpus. While the state acknowledges that it had a duty to affirmatively disclose its assistance to Duncan, it contends that the district court properly found the error to be harmless beyond a reasonable doubt. As for the alleged confrontation clause violation (i.e., the restriction on the cross-examination of Wesley), the state argues, first, that the district court erroneously concluded that the restriction amounted to a violation of the confrontation clause and, second, that in any event, the district court properly found the error to be harmless beyond a reasonable doubt. As to all other alleged errors, the state contends that the district court's rulings are correct.

## ISSUES PRESENTED

We address the following issues:

1. Whether the district court correctly found the state's nondisclosure of evidence and failure to correct Duncan's inaccurate testimony, regarding her agreement with the state, to be harmless beyond a reasonable doubt;

2. Whether the district court properly held the trial court's restriction on the cross-examination of Wesley (concerning her pending criminal charge) to be error, but harmless beyond a reasonable doubt;

3. Whether the district court erred when it determined that Francis's trial counsel provided effective assistance during the penalty phase of the trial;

4. Whether the district court erred when it found the trial court's decision to override the jury's life recommendation and to impose death to be constitutionally proper;

5. Whether the trial court's application of the aggravating factor, "cold, calculated, and premeditated" violated the ex post facto clause;

6. Whether sufficient evidence supports the trial court's application of the aggravating factors "heinous, atrocious, or cruel," "cold, calculated, and premeditated," and disrupting or hindering the "enforcement of laws" when sentencing Francis;

7. Whether the Florida Supreme Court and the state trial court applied the aggravating factors "heinous, atrocious, or cruel," and "cold, calculated, and premeditated" in an unconstitutionally overbroad manner; and

8. Whether the district court correctly found the trial court's imposition of the death penalty, after having previously offered Francis a life sentence if he would plead guilty to first-degree murder, to be proper.

## DISCUSSION

### A. *Brady/Giglio* Issue

■ The state's suppression of material evidence which is favorable to a defendant or exculpatory amounts to a deprivation of due process of law. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Delap v. Dugger,* 890 F.2d 285, 298–99 (11th Cir.1989). Similarly, "presentation [by the state] of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d

104 (1972). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The state violated these principles when it (1) failed to disclose its 1983 agreement with Duncan (to assist in a 3.850 proceeding) and (2) did not take the steps necessary to correct Duncan's inaccurate testimony regarding the specifics of her agreement with the state.

Where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury" we will reverse the conviction. *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985) (quoting *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397). We will not reverse, however, where prosecutorial misconduct is "harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 680, 105 S.Ct. at 3382.

Francis contends that the district court erred when it concluded that the state's failure to fully disclose its assistance to Charlene Duncan, as well as its deliberate deception, amounted to harmless error. According to Francis, under no construction can it be said that the prosecutorial misconduct amounted to harmless error.

No reasonable possibility or likelihood exists that the state's nondisclosure and failure to correct Duncan's inaccurate testimony could have affected the outcome of the trial. *See Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. As the district court correctly found:

> Duncan acknowledged at trial that she was serving a life sentence without parole for twenty-five years for the murder of Walters, and that she had agreed to testify for the State against Francis in return for either a new trial or plea to a lesser offense. She testified she was scheduled for resentencing on the matter a few days after Francis' trial. She testified she had not been pardoned, but 'could get one.' Francis' counsel argued in his closing statement that she might receive a lesser sentence at her hearing. Although he did not know that the State

had been substantially involved in attempting to obtain a reduced sentence for the witness, he fully explored with the witness that she hoped to obtain a reduced sentence or 'pardon.' The record was abundantly clear that Duncan was portrayed as one motivated by her own self-interest to testify.

*Francis v. Dugger*, 697 F.Supp. at 477.

Moreover, the state presented overwhelming evidence of Francis's guilt: (1) three other eyewitnesses offered substantially the same accounts as did Duncan; (2) numerous items of physical evidence corroborated the four eyewitness accounts; (3) Francis had a clear motive for the murder, the elimination and punishment of the victim for his activities as a law enforcement informant; and (4) Francis gave inconsistent statements after his arrest. Under these circumstances, we hold that the district court correctly found the state's conduct, though improper, to be harmless beyond a reasonable doubt. Finally, Francis is not entitled to an evidentiary hearing because the relevant material facts are not in dispute. *See Agan v. Dugger*, 835 F.2d 1337, 1338 (11th Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 884 (1988).

### B.   Confrontation Clause

■ Francis contends that the trial court's decision to completely foreclose his counsel from cross-examining Deborah Wesley concerning her then pending second-degree murder charge, violated his sixth amendment right of confrontation. Further, Francis argues that the district court erred when it held the confrontation clause error to be harmless beyond a reasonable doubt.

The confrontation clause of the sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." "The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination*." *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, Evidence

§ 1395, p. 123 (3d ed. 1940)) (emphasis in original). The confrontation clause does not, however, prevent a trial court from imposing any limits on the cross-examination of a prosecution witness concerning that witness's potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). A trial court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435.

We hold that the trial court did not err when it prohibited Francis's counsel from cross-examining Wesley concerning her pending murder charge. Francis's proposed line of inquiry into Wesley's "bias or motive" was, given the factual context of the pending charge, marginally relevant and, therefore, inadmissible. *See Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435. The charge against Wesley arose from the murder of her husband during a domestic dispute and was wholly unrelated to the crime for which Francis was being tried. Moreover, although Francis's counsel deposed Wesley prior to her testimony, Francis did not offer any evidence or proffer of a deal with the state. Finally, as the Florida Supreme Court concluded, Francis did not proffer "what answer [Wesley] would give or how her answer would be relevant to prove a material fact other than her bad character or propensity toward violence." *Francis v. State*, 473 So.2d 672, 674–75 (Fla.1985).

Even if the trial court's prohibition on the cross-examination of Wesley were error, we would find it to be harmless beyond a reasonable doubt. In *Van Arsdall*, the Supreme Court discussed the relevant factors in determining whether a confrontation clause violation is harmless:

These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. In this trial, other witnesses corroborated Wesley's testimony, Francis's counsel subjected Wesley to extensive cross-examination bearing on her credibility, and the state, as previously noted, presented overwhelming evidence of Francis's guilt. Finally, Francis is not entitled to an evidentiary hearing because, as the district court held, the material facts are not in dispute. *See Agan*, 835 F.2d at 1338.

C. Effective Assistance of Counsel

■ Francis contends that the district court erred when it concluded that his counsel provided effective assistance during the penalty phase of the trial. According to Francis, his counsel failed to investigate and prepare for the penalty phase of the trial. Specifically, Francis contends that two types of evidence in mitigation were available—evidence about his impoverished, abused, and socio-economically limited childhood, and evidence of his brain dysfunction, diagnosed by his expert as fetal alcohol syndrome. Either or both of these nonstatutory mitigating factors, according to Francis, would have provided a reasonable basis for a life sentence.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-part test for determining whether the assistance of counsel is so defective as to require reversal of a death sentence:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a

trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the ... death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687, 104 S.Ct. at 2064. Assessment of the effectiveness of counsel is a mixed question of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. In evaluating the assistance of counsel, we are guided by a strong presumption that counsel's representation falls within the wide range of reasonable professional assistance:

Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).

We reject Francis's argument that his counsel rendered deficient assistance during the penalty phase of the trial. Trial counsel made a decision to deliver a highly impassioned, emotional argument which, rather than focusing on Francis, emphasized the Easter season, forgiveness, compassion, and the value of life. We cannot say that this strategy was unreasonable given counsel's reasoned belief (based upon previous conversations with the trial judge and the court's plea offers) that the trial judge would follow a life recommendation. As did the district court and the Florida Supreme Court, we find it significant that Francis's trial counsel obtained a life recommendation from the jury, following brief deliberations, where two prior juries had recommended death by twelve to zero votes. *See Francis v. Dugger,* 697 F.Supp. at 481; *Francis v. State,* 529 So.2d at 672.

Contrary to Francis's assertions, trial counsel had no reason to retain a mental health expert who would testify that Francis suffered brain damage, and therefore could not appreciate the criminality of his conduct or conform his conduct to the requirements of the law. The facts of the offense show that Francis had a heightened appreciation for the criminality of his conduct. Further, as shown by various statements Francis made during the trial, he is articulate and his speech exhibits highly structured and organized reasoning. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.... And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.")

■ Moreover, trial counsel's decision not to investigate and present evidence regarding Francis's family background does not amount to deficient assistance. Under certain circumstances, trial counsel's decision not to investigate family childhood background may legitimately be the product of a reasoned tactical choice. *See Stanley v. Zant,* 697 F.2d 955, 970 (11th Cir.1983), *cert. denied,* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984). Given the particular circumstances of this case including, among other things, the fact that Francis was thirty-one years old when he murdered Titus Waters, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight. *See Francois v. Wainwright,* 763 F.2d 1188, 1191 (11th Cir.1985). Consequently, trial counsel cannot be faulted for expending his limited time and resources on other vital areas.

Even if we were to hold that trial counsel should have introduced the "mitigating" evidence Francis urges, we would still af-

firm. We are not persuaded that Francis satisfied the second prong of *Strickland* by demonstrating any prejudice from trial counsel's alleged deficiencies. *See Strickland*, 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068. Finally, the district court correctly held that Francis is not entitled to an evidentiary hearing on this issue because he received a full and fair hearing during his state 3.850 proceeding. *See Agan*, 835 F.2d at 1338.

### D. Jury Override

■ In Florida, a jury's recommendation of a life sentence is entitled to "great weight," and may only be overturned by a sentencing judge if "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975). The jury override procedure in Florida is constitutionally valid only to the extent that it does not lead to arbitrary or discriminatory capital sentencing. *See Spaziano v. Florida*, 468 U.S. 447, 465, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984).

■ Francis contends that the trial court's override of the jury's recommended sentence of life resulted in an arbitrarily, capriciously, and unreliably imposed sentence of death in violation of the eighth and fourteenth amendments. Specifically, Francis maintains that reasonable bases existed for the jury's life recommendation including: (1) Francis's life as a model prisoner; (2) the trial court's finding that Francis did not have a significant prior criminal history; and (3) the fact that none of Francis's co-defendants received the death penalty. Taken together, Francis argues, the record before the jury contained mitigating circumstances which provided a reasonable basis for the life recommendation.

The central question is whether the state's application of the override scheme in this case resulted in the arbitrary or discriminatory imposition of the death penalty. *Parker v. Dugger*, 876 F.2d 1470, 1473–76 (11th Cir.1989). Our role is not to second-guess the Florida courts on questions of state law, particularly on whether the trial court complied with the mandates of *Tedder*, but rather to determine whether the trial court, in Francis's case, imposed the death penalty in an arbitrary or discriminatory manner. *See Parker*, 876 F.2d at 1475.

We find the trial court's override to be neither arbitrary nor discriminatory. First, the Florida Supreme Court noted that the jury's life recommendation may well have been the product of defense counsel's highly impassioned emotional closing argument, and thus under Florida law, the recommendation is not entitled to its normal weight. *Francis v. State*, 473 So.2d at 676–77. Second, the Florida Supreme Court found the trial court's conclusion that Francis had no significant prior criminal history (which included a 1976 conviction for sale of heroin) to be erroneous. *Francis v. State*, 473 So.2d at 677. Third, the record demonstrates the existence of three valid aggravating factors; it was a deliberately planned, torture murder, of a government informant. Finally, no valid statutory mitigating factors existed, and the nonstatutory mitigating factors were only (a) that Francis has been a model prisoner and (b) that Francis's co-defendants, whose involvement was insignificant when compared to that of Francis, did not receive the death penalty. Even in override cases, however, the mere presence of mitigating evidence does not automatically provide a reasonable basis for the jury's recommendation. *See Pentecost v. State*, 545 So.2d 861, 863 n. 3 (Fla.1989). Consequently, we hold that the trial court's override of the jury's life recommendation is not constitutionally infirm.

### E. The Other Issues

1. "Cold, Calculated, and Premeditated" and the Ex Post Facto Clause

■ Francis contends that the trial court's application of the aggravating circumstance "cold, calculated, and premeditated" violated the ex post facto clause, article 1, section 10 of the United States Constitution. (The Florida Legislature added this statutory aggravating factor to the list after the murder occurred but before

Francis's conviction.) In *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), the Supreme Court set out the test for determining whether a statute is ex post facto: "two critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'" 482 U.S. at 430, 107 S.Ct. at 2451 (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). We hold that no ex post facto violation occurred because the application of the aggravating circumstance "cold, calculated, and premeditated" did not disadvantage Francis. As the district court reasoned:

> [T]he facts on which the trial judge relied in applying the 'cold, calculated, and premeditated' factor were the same facts underlying application of other aggravating factors, such as 'hindering law enforcement' and 'especially atrocious and cruel.' Francis argues that the retrospective application of this factor adversely affected his sentence because the trial judge mistakenly enumerated three, rather than two aggravating factors. The Florida sentencing scheme is not founded on 'mere tabulation' of aggravating and mitigating factors, but relies instead on the weight of the underlying facts. *Herring v. State*, 446 So.2d 1049, 1057 (Fla.1984).... [I]t was proper for [the trial court] to consider those specific circumstances in sentencing.

*Francis v. Dugger*, 697 F.Supp. at 482.

## 2. The Aggravating Factors

Francis argues that the state presented insufficient evidence to support a finding that the aggravating factors "heinous, atrocious, or cruel," "cold, calculated and premeditated," and disrupting or hindering the "enforcement of laws" existed beyond a reasonable doubt. *See* Fla.Stat. § 921.141(5)(g), (h), (i); *Jent v. State*, 408 So.2d 1024, 1032 (Fla.1981). We hold that the state offered sufficient evidence to sup-

port a finding of these aggravating factors. *See Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987).

## 3. *Maynard/Godfrey* Claims

■ Francis also contends that the trial court and the Florida Supreme Court interpreted and applied the aggravating factors "cold, calculated, and premeditated" and "heinous, atrocious, or cruel" in an unconstitutionally overbroad manner. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Following our recent decisions in *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir.1989), and *Bertolotti v. Dugger*, 883 F.2d 1503, 1526–27 (11th Cir. 1989), we conclude that Francis's *Maynard/Godfrey* claims are without merit. First, the Florida Supreme Court has adequately limited the class of capital murders to which these aggravating circumstances can be applied. *See Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976) ("heinous, atrocious, or cruel" is constitutional because Florida Supreme Court has limited its application); *Harich v. Wainwright*, 813 F.2d 1082, 1102–03 (11th Cir.) (Florida Supreme Court's construction adequately narrows "cold, calculated, and premeditated"), *vacated* 828 F.2d 1497 (11th Cir.1987), *dist. ct. disposition adopted on rehearing*, 844 F.2d 1464 (11th Cir.1988). Second, the trial court explicitly found the facts to warrant these aggravating circumstances. *See Bertolotti*, 883 F.2d at 1527. Finally, we can see a "'principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not.'" *Bertolotti*, 883 F.2d at 1527 (quoting *Godfrey*, 446 U.S. at 433, 100 S.Ct. at 1767).[2]

## 4. Pre-verdict Offer of Life/Post-verdict Jury Override

■ Finally, Francis contends that the district court erred when it concluded that

---

**2.** The state argues that Francis's *Maynard* claims are totally unexhausted as well as procedurally barred. We do not address these contentions because the state did not raise them

before the district court. *See e.g., Boykins v. Wainwright*, 737 F.2d 1539, 1545 (11th Cir. 1984), *cert. denied*, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985).

the trial court acted properly when it imposed the death sentence after offering a plea to "first and life" prior to the jury's verdict. We agree with the district court that Francis is not entitled to relief on this basis. *See Hitchcock v. Wainwright*, 770 F.2d 1514, 1518–20 (11th Cir.1985) (in banc) (it is not improper for a trial court to offer life sentence in exchange for guilty plea, and then to impose the death penalty after trial), *rev'd on other grounds sub nom.*, *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

We have considered the remaining issues Francis raised and find them to be without merit.

## CONCLUSION

In sum, we conclude that the district court properly denied Francis's petition for a writ of habeas corpus.

AFFIRMED.